# Exhibit D

1   STATE OF ILLINOIS  )
                       )  SS:
2   COUNTY OF KANE     )

3     IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                    KANE COUNTY, ILLINOIS
4

5   PEOPLE OF THE STATE OF ILLINOIS,    )
                                        )
6                        PLAINTIFF,     )
                                        )
7              VS.                      )  NO. 19 CF 2412
                                        )
8   AARON FEIZA,                        )
                                        )
9                        DEFENDANT.     )

10          REPORT OF PROCEEDINGS had at the hearing in

11   the above-entitled cause before the Honorable JOHN A.

12   BARSANTI, Judge of said Court, on the 21st day of

13   May, A.D. 2021.

14          PRESENT:

15          MS. JAMIE MOSSER,
              State's Attorney, by
16          MR. JOSEPH CULLEN,
              Assistant State's Attorney, and
17          MR. JOHN KEZDY,
              Assistant Attorney General,
18              appeared for the People of the
              State of Illinois;
19
            MR. DAVID CAMIC and
20          MR. GARY JOHNSON,
              Attorneys at Law,
21              appeared for the Defendant.

22

23   DEBBIE D. SCHWEER, CSR
     Official Court Reporter
24   Illinois CSR #084-002319

```
 1                    (Whereupon, the following

 2                     proceedings were had

 3                     before Court and counsel

 4                     in open court:)

 5          THE COURT:  People of the State of Illinois vs.

 6     Aaron Feiza, F-e-i-z-a, 19 CF 2412.

 7               Names for the record, State?

 8          MR. CULLEN:  Joe Cullen on behalf of the State.

 9          MR. KEZDY:  John Kezdy, assistant attorney

10     general, on behalf of the State.

11          MR. GAY:  Joe Gay for the State as well.

12          MR. CAMIC:  Judge, David Camic and Gary Johnson

13     on behalf of the defendant.

14          THE COURT:  All right.

15               This matter is up for motions hearing.

16               In the past couple of weeks, I have

17     received a lot of paperwork from the parties in this.

18               I have been able to look at most of it.

19               I think I have been able to look at all of

20     it.

21               Where do you want to start?

22               I think these are all your motions; right,

23     Mr. Camic, Mr. Johnson?

24          MR. CAMIC:  Yes.
```

 1                    For the most part, they are all ours.

 2                    That being said, I am willing to consider

 3      any order that The Court or counsel wants to address

 4      these motions.

 5          THE COURT:  Well, do you have a preference,

 6      Mr. Cullen?

 7          MR. CULLEN:  They are all defense motions; and,

 8      I mean, we can do them in the order, I guess, that

 9      they were filed.

10                    I think --

11          THE COURT:  You have responses also; right?

12          MR. CULLEN:  I have responses, yes, Judge.

13                    We did file responses.

14          THE COURT:  If you want me to do this, I can

15      pull it out.

16                    How about the defendant's first motion in

17      limine?

18          MR. CULLEN:  Which one would that refer to?

19          THE COURT:  I am kind of referring to the fact

20      that I know there is a third, which I think that

21      would mean there would be a second and a first.

22          MR. CAMIC:  Judge, is that the one referring to

23      nonexpert testimony?

24          THE COURT:  I don't know.

1          I am just making a shot in the dark here.

2          I thought you guys would know.

3     MR. GAY:  That is the first one.

4     THE COURT:  Which one is that, Mr. Gay?

5     MR. GAY:  Filed on March 11th.

6          It's just entitled motion in limine to bar

7     certain evidence.

8     THE COURT:  All right.

9          I have seen that once, and I have been able

10    to look at that.

11         All right.

12         Does that work for you, defense?

13    MR. CAMIC:  Yes, Judge.

14         There is one issue we should probably

15    address ahead of time.

16    THE COURT:  Go ahead.

17    MR. CAMIC:  And, that is, as we arrived at the

18    courthouse today, we were given a verbal disclosure.

19         As you know, part of our motions involve a

20    videotape, and the videotape -- I guess it's not

21    really a videotape.

22         The recording allegedly involves the

23    defendant.

24         We learned today that this recording was

1    given to the state police prior to the search warrant

2    execution at the Brown residence.

3              I know you have read everything.

4              So I will skip to there.

5              They were aware of it.

6              They may or may not have a copy of it, but

7    we just learned of this today.

8              To the extent that it is or may be Brady

9    material, we have no idea.

10             It wasn't until just now that we knew of

11   its existence.

12        THE COURT:  Let me see if I get this.

13             You have never seen it?

14        MR. CAMIC:  No.

15        THE COURT:  And they don't know where it is?

16        MR. CAMIC:  That I don't know.

17             We subpoenaed Master Sergeant File, who

18   revealed this to the prosecution today, who told us

19   when we got here.

20        THE COURT:  Told you what?

21        MR. CAMIC:  Master Sergeant File from the state

22   police, that's the gentleman in the back row.

23        THE COURT:  Yeah.

24        MR. CAMIC:  I think perhaps we should hear from

1    him, but apparently he told the prosecutors about

2    this video today.

3         THE COURT:  Okay.

4         MR. CAMIC:  And when we got here, they, the

5    prosecutors, told us, Mr. Johnson and myself.

6         THE COURT:  All right.

7              Well, I don't know.

8              I mean, I don't know what you want to do

9    about that today.

10              I mean, obviously, I think that has some

11    impact on the case; but I don't imagine you are ready

12    to file something on that today.

13         MR. CAMIC:  No, I wouldn't.

14              I mean, obviously, we will have to.

15              As we go through the proofs on this, it may

16    be something we would want to --

17         THE COURT:  Okay.

18              I got you.

19              So there may be something on this if you

20    ever get to see it which may add or subtract from

21    your motion?

22         MR. CAMIC:  Yes, sir.

23         THE COURT:  I think that's pretty obvious that

24    I would obviously let you add to your motions and

1    reopen your motions if there is some information that

2    you think would be relevant.

3           Do you have some objection to that,

4    Mr. Cullen, or counsel?

5      MR. CULLEN:  No.

6           It's true that I learned some information

7    today.

8           I provided that to Mr. Camic.

9           He spoke to the master sergeant involved

10   apparently.

11          I did learn that a copy of the recording,

12   which has already been disclosed --

13     THE COURT:  The witness in the back, are you

14   intending to call him?

15     MR. CAMIC:  Yes, Judge.

16     THE COURT:  Okay.

17          Let him get out of the courtroom then if

18   you are going to talk about this.

19          All right.

20          Go ahead, Mr. Cullen.

21     MR. CULLEN:  I got some information today.

22          I passed it on to the defense.

23          If the police have a copy of any recording,

24   I will obtain it and get it to them.

1        THE COURT: I certainly would expect that.

2              The only thing I am concerned about -- and

3  I think this is Mr. Camic's concern -- is that if you

4  are going to go into these motions, something may be

5  relevant after they view that.

6              I am going to let them come back in and

7  have additional hearings if we need to do that.

8              I think that's the only fair way to

9  proceed.

10      MR. CULLEN: I have no problem with that at all,

11  Judge.

12      MR. CAMIC: Judge, while we are on the topic,

13  can we request a supplemental report indicating the

14  conversation that Sergeant File had with Mr. Cullen

15  and his steps he takes to get this to us?

16            And we will need the case number so we can

17  perhaps subpoena that underlying file.

18      THE COURT: Well, let me put it this way.

19            I don't know that I am in a position where

20  I can tell the State how to respond to their

21  discovery request.

22            If that is what you want, Mr. Camic, why

23  don't you put that into a motion so they know exactly

24  what you want, and then I can start talking about

1    that.

2            MR. CAMIC:  Yes, sir.

3            THE COURT:  All right.

4                Anything else before we begin, Mr. Camic?

5            MR. CULLEN:  And I think, you know, going back

6    to the order, Mr. Camic has subpoenaed a few

7    witnesses.

8                Maybe if we -- I know we are getting a

9    little bit late today.

10               Maybe we should have those witnesses

11   testify so they can get out of court.

12               Sergeant File is here.

13               Maybe that's the motion we should go

14   forward on first, which I think they called it motion

15   to suppress unlawfully obtained evidence, which

16   refers to the eavesdropping evidence.

17           THE COURT:  It doesn't matter to me.

18               I think that probably makes some sense if

19   you have got live people here and we can get them on

20   the record.

21               We have an hour and a half.

22               It doesn't matter to me where you start.

23           MR. JOHNSON:  Some of these, Judge, overlap.

24               In other words, we are planning on calling

1    Sherry Kublick.

2              She overlaps.

3              I mean, that testimony deals with what Mr.

4    Cullen talks about, deals with the first motion in

5    limine.

6         THE COURT:  Again, some of this is up to you.

7              If you want to keep calling her back when

8    every motion comes back, you know, that's one way to

9    do it; or we can get testimony from her today if that

10   will cover all of it.

11             I don't know.

12             I mean, I think it's probably how you want

13   to proceed.

14             It doesn't matter to me.

15             I want to give you as much time as any of

16   the parties want in this case.

17             I will give you as much time as you need to

18   get this done.

19             I have been able to read through the

20   pleadings, and there is some complicated issues here.

21             However you want to proceed with this is

22   fine with me.

23             So what do you want to do?

24             Mr. Cullen does have a decent point.

1           We may be able to save calling people back.

2      MR. CAMIC:  We don't mind starting with Sergeant

3  File.

4      THE COURT:  Which motion would that apply to?

5      MR. CAMIC:  The motion to suppress testimony.

6          I will give you the full title.

7      THE COURT:  That's the response.

8          The motion to suppress unlawfully obtained

9  evidence?

10     MR. CAMIC:  Yes.

11     THE COURT:  I know I have that here.

12        Maybe I don't.

13        I have the State's response to that motion.

14     MR. JOHNSON:  That was filed on March 11th.

15     THE COURT:  I can pull it up on the screen here.

16        I am sure I read that motion.

17        Is that what you want to start with?

18     MR. CAMIC:  That's fine, Judge.

19     THE COURT:  Okay.

20        March 11th, Mr. Johnson?

21     MR. JOHNSON:  That's when it was filed, yes.

22     THE COURT:  2021?

23     MR. JOHNSON:  '21.

24     THE COURT:  All right.

1          I do have the motion to suppress unlawfully

2    obtained evidence filed on March 11th.

3          Okay.

4          Go ahead.

5     MR. CAMIC:  Judge we will call Detective File.

6     THE COURT:  Swear the witness, please.

7                    (Witness sworn.)

8     THE COURT:  Take a seat where the bailiff is

9    pointing.

10          There is a metal item on the table in front

11    of you.

12          You can get close to that, but don't put

13    your hand on it.

14          It stops it from working properly.

15          Let's talk about your mask.

16          You have a screen between you and the court

17    reporter.

18          You are more than six feet away from

19    everybody else.

20          If it starts to be where we have difficulty

21    hearing you, I am going to ask you to take your mask

22    off.

23          Are you all right with that?

24     THE WITNESS:  Yes, sir.

1          THE COURT:  Okay.

2              Go ahead.

3          MR. CAMIC:  Judge, what is your preference at

4      counsel table?

5              Masks on or off?

6          THE COURT:  No.

7              That's fine.

8                              JEFF FILE,

9      called as a witness herein, having been first duly

10     sworn, was examined and testified as follows:

11                     DIRECT EXAMINATION

12     BY MR. CAMIC:

13         Q    Can you tell us your full name and tell us

14     your office, please.

15         A    I am Master Sergeant Jeff File with the

16     Illinois State Police assigned to the North Central

17     Narcotics Task Force.

18         Q    How long have you been doing that?

19         A    I have been assigned with the State Police

20     to the North Central Narcotics Task Force since

21     February of 2007.

22         Q    And you are still doing that today;

23     correct?

24         A    That is correct.

1      THE COURT: Hold on just for a second.

2      State your name and spell it again, please.

3      THE WITNESS: Jeff File, F-i-l-e.

4      THE COURT: Okay.

5      Go ahead, Mr. Camic.

6  BY MR. CAMIC:

7      Q   Mr. File, you were so employed -- I guess

8  we have established that.

9      You had occasion to execute a search

10  warrant at the home of a Mr. Walter Brown?

11      A   Yes, sir.

12      Q   The information for that search warrant,

13  where did that come from?

14      A   A confidential informant.

15      Q   Do you know the name of that confidential

16  informant?

17      A   Yes, sir.

18      Q   You are aware that that confidential

19  informant is in this case?

20      A   Yes, sir.

21      Q   That confidential informant is -- I will

22  mispronounce it probably -- Ms. Kublick,

23  K-u-b-l-i-c-k?

24      A   Yes, Ms. Sherry Kublick.

1  Q She apparently was living with Mr. Brown at

2 the time?

3  A Yes, sir.

4  Q When you executed that search warrant,

5 there were other members of the state police with

6 you?

7  A Yes, sir.

8  Q Were there also inspectors, non state

9 police employees who work with the narcotics unit?

10  A Yes.

11   They are identified by the state police.

12  Q Prior to the execution of that search

13 warrant, did you interview Ms. Kublick?

14  A I was not the person who originally

15 interviewed her, but I did talk to her several times

16 before the search warrant, yes.

17  Q Okay.

18   Who originally spoke to her?

19  A Sergeant Christopher Burk and Inspector

20 Melinda Anyon.

21  COURT REPORTER:  Could you spell that, please?

22  MR. CAMIC:  I think it's A-n-a-y-a.

23   Does that sound right?

24  THE WITNESS:  A-n-a-y-o-n, I think.

1          She is with the St. Charles Police
2    Department.
3    BY MR. CAMIC:
4          Q    As I look down, I see it.
5               Would A-n-y-o-n be correct?
6          A    Yes, that is correct.
7          Q    At one point in your conversation or your
8    review of the reports, she, Ms. Kublick, shared with
9    members of the state police that she had a video of
10   Mr. Feiza?
11         A    Yes, sir.
12         Q    Did she tell you how that came to be made?
13         A    Yes, sir.
14         Q    What did you learn?
15         A    The night in question, they started
16   drinking at the American Legion.
17              They then went to a party at Derek Feiza's
18   house.
19              From there, herself and Walter Brown went
20   to Mr. Brown's residence where later that
21   evening/morning Mr. Feiza and, I believe, Mr. Wood
22   came to the residence, continued on drinking, using
23   cocaine.
24         Q    Let me interrupt you.

1          At some point during this evening, you

2     learned that Ms. Kublick had actually made a

3     recording with her cell phone; is that correct?

4          A     Yes, sir.

5          Q     Did she have this recording on her when you

6     interviewed her?

7          A     I can't recall.

8                I know -- I believe during the original

9     interview of her is when they learned of the video.

10         Q     You are not aware whether they viewed the

11    video, or you are aware?

12         A     I believe they did at that time.

13         Q     Okay.

14               Can you tell us what was done to

15    authenticate the video?

16         A     Authenticate it?

17         Q     Yeah, make sure it was accurate.

18         A     I believe they might have downloaded it.

19               I don't know -- in speaking with her at

20    that time, she told this is exactly what happened.

21         Q     Did she tell you she had more than one

22    video?

23         A     Again, I wasn't at the original interview.

24               I can't recall from our prior

1    conversations.

2        Q    I notice you brought a large packet of

3    reports with you today.

4        A    Those are the -- none of those have any

5    reports of interviews with Ms. Kublick.

6        Q    Other than the reports of interviews with

7    Ms. Kublick, they are contained in the police report

8    records of --

9        A    Aaron Feiza's, correct.

10       Q    You don't have anything regarding that

11   initial interview?

12       A    That is correct.

13       Q    And did you interview her after that?

14       A    As we began working the investigation,

15   Sergeant Burk was getting ready to be taken out of

16   the unit, and I was brought into the investigation.

17       Q    You essentially took over the investigation

18   from Sergeant Burk?

19       A    Directing the investigation.

20            Inspector Anyon was the case agent.

21       Q    Did you have a chance to review the video?

22       A    At some point, I reviewed the video.

23            I can't recall when.

24       Q    Do you know how?

1      A      I believe Master Sergeant Backus showed it

2   to me, if I remember correctly.

3      Q      Did he show it to you on an online

4   platform?

5             Did he show it to you on his phone?

6             Is it on the cloud somewhere?

7             Or do you know?

8      A      I believe he had a CD, if I remember

9   correctly.

10      MR. CULLEN:  Your Honor, I am going to object to

11   foundation, because I am not sure which video they

12   are talking about here.

13      MR. CAMIC:  I will be happy to clear it up,

14   Judge.

15      THE COURT:  Go ahead.

16   BY MR. CAMIC:

17      Q      How many different videos did you review?

18      A      I believe the video -- if my memory serves

19   me right, the recording that they made off of her

20   phone and then the video that I -- we received from

21   Walter Brown's phone are the two that I remember.

22      Q      So you received a video from Sherry

23   Kublick's phone?

24      A      I believe Sergeant Burk and Inspector Anyon

1    obtained a video from that phone, yes.

2        Q    I apologize, Judge.

3            The royal we, the state police received a

4    video from Ms. Kublick's phone is your belief?

5        A    Yes.

6        Q    And then later on you received a video from

7    Mr. Brown?

8        A    Yes.

9        Q    Now, you got it from Mr. Brown after the

10   execution of a search warrant at his house; right?

11       A    Yes, that evening.

12       Q    Okay.

13            And the search warrant was executed about

14   what time would you say?

15       A    It was, I believe, later afternoon.

16       Q    Who was present at the home when the search

17   warrant was executed?

18       A    Mr. Brown was, Ms. Kublick, and they had

19   one other roommate that was there.

20       Q    So Ms. Kublick was present when the search

21   warrant was executed that she was your informant who

22   obtained the search warrant?

23            Is that accurate?

24       A    That is correct.

```
1         Q     After Mr. Brown was taken into custody, you

2    performed -- you and the other members of the state

3    police and your unit performed a search of the house?

4         A     That is correct.

5         Q     At the search of the house, you recovered a

6    great number of pieces of evidence?

7               Is that fair?

8         A     Yes, sir.

9         Q     If I told you it was roughly 33 pieces of

10   evidence, would that sound right?

11        A     That sounds close.

12        Q     Would you like to check your report?

13        A     That's okay, sir.

14        Q     Among those pieces of evidence were a

15   number of items in the basement of that house; is

16   that correct?

17        A     Yes, sir.

18        Q     Including from the basement you took a

19   plate?

20        A     We did, yes.

21        Q     But that wasn't you personally?

22        A     No, sir.

23        Q     You took eight bags of cocaine?

24        A     That sounds correct.
```

1      Q    Do you need your report?

2      A    I would have to check the report to say

3 exactly how many bags; but, again, I did not locate

4 any of the evidence.

5      Q    What about a glass snorter with suspected

6 cocaine?

7      A    Yes, sir.

8      Q    Drug packaging material with suspected

9 cocaine?

10      A    Yes, sir.

11      Q    A are grinder with suspected cocaine?

12      A    I would have to look at the report.

13           Again, I did not collect any of the

14 evidence.

15      Q    May I bring it to you?

16      A    Yes.

17      Q    Is it this one?

18      A    Yes, sir.

19      Q    I think we are looking at page 2891.

20      A    Actually, I do not have Brown's reports

21 with me.

22           I have Feiza's reports.

23      Q    How many cell phones did he have on his

24 person?

```
 1         A    I don't recall how many cell phones

 2    actually on his person.

 3              I would have to review the reports to tell

 4    you where cell phones were located.

 5         Q    Let me ask you this:

 6              He was arrested and transported to the St.

 7    Charles Police Department?

 8         A    That is correct.

 9         Q    Who transported him?

10         A    Myself and Inspector Anyon.

11         Q    While he was in the car with you between

12    his house and the St. Charles Police Department, he

13    told you about a recording he had; did he not?

14         A    I don't recall him saying recording.

15              He informed us he knew a dirty cop.

16         Q    When you got to the St. Charles Police

17    Department, he had already bean searched; right?

18         A    That is correct.

19         Q    And you gathered the evidence we talked

20    about and more evidence?

21              Is that fair?

22         A    Mr. Brown was at the police department

23    while they were still searching the residence.

24         Q    At some point, you had a recorded interview
```

```
 1    with him?

 2         A    That is correct.

 3         Q    And in that recorded interview, on the

 4    table were a number of cell phones?

 5         A    Yes.

 6              I actually believe there were two.

 7         Q    Two?

 8         A    I believe so.

 9         Q    So if there was an extra phone or two on

10    the table, that would be yours or Inspector Anyon's?

11         A    Yes, sir.

12         Q    These two were an IV and a Motorola phone?

13              Does that sound right?

14         A    Yes.

15         Q    In this conversation you had with him at

16    the police station, he told you that both phones had

17    videos on them; did he not?

18         A    I can't remember if he told us that both

19    phones or one phone had videos.

20         Q    You would -- I take it at some point we

21    could refer to the tape, and that would refresh your

22    recollection?

23         A    That would, sir.

24         Q    And he told you he had made this video,
```

1    quote, in case something happened, close quote;

2    right?

3        A    Yes, sir.

4        Q    He told you he was prepared in the event he

5    got arrested; is that correct?

6        A    Yes, sir.

7        Q    And did he not say to you at about 22:30 on

8    the timestamp that there were on his phones tons and

9    tons of videos there?

10       A    Referring to all the videos he has on his

11   phone, not just --

12       Q    Did he tell you how many videos he had of

13   Mr. Feiza other than the one that you made a

14   duplicate of at some point?

15       A    I would have to watch the video to refresh

16   my memory.

17       Q    Based on his statements to you, could you

18   tell His Honor when you did the Cellebrite download?

19       A    I believe the video that we downloaded was

20   not off of Cellebrite.

21            It was pulled off the phone onto a CD.

22       Q    You needed to get Wi-Fi to do that?

23       A    No.

24            Just connecting the phone to the computer

1    you can drag the file over to the CD.

2         Q    Did you do a Cellebrite download?

3         A    I don't think we ever did a Cellebrite

4    download.

5              I would have to review the reports to

6    verify.

7              I don't think we ever did a full download.

8         Q    I know His Honor has seen a Cellebrite

9    download.

10             In fact, in reviewing the evidence in this

11   case, he might have seen this Cellebrite download.

12             But, for the record, can you tell us what a

13   Cellebrite download is?

14        A    A Cellebrite download is a technology that

15   basically takes the information off the cellphone,

16   downloads it to a computer system where you can

17   review different videos, files, text messages, phone

18   calls off the phone.

19        Q    And those things pull off of the phone

20   information that the owner of the phone may even

21   believe was deleted?

22             Is that fair?

23        A    Depending on which version you have, yes.

24        Q    And the Cellebrite download that you used

1    for Mr. Feiza's phone -- you did a download of his

2    phone; correct?

3        A    Yes, sir.

4        Q    That was a high quality program you used?

5             Is that fair?

6        A    They had to go through the South Suburban

7    Major Crime Task Force to use their software, yes.

8        Q    While you were in this video with -- while

9    you were in the interview with Mr. Brown, he also

10   told you that he had information recording a person

11   he had sold cocaine to, did he not, a Mr. Van Hatten,

12   Charles Van Hatten?

13       A    I believe so.

14       Q    He gave you the gentleman's name?

15       A    Yes, sir.

16       Q    And address?

17       A    Yeah, I believe so.

18            I can't remember if it was the exact

19   address or --

20       Q    I apologize.

21            I am not asking you that.

22            But he gave you an address?

23       A    I would have to review the report.

24       Q    Maybe to refresh your recollection, if you

1    actually showed a phone to him and he was able to

2    pull out a satellite image or a map image of the

3    location of this person, do you recall that now?

4         A    I believe so.

5              I did not review the video or that report

6    before today.

7         Q    Okay.

8              And I apologize.

9              He also had the gentleman's IDOC number;

10   right?

11        A    I would have to review with the report.

12        Q    You decided -- well, of the two phones, you

13   are not sure if either one of those was the subject

14   of a Cellebrite download; correct?

15        A    Of Mr. Brown's phones, I am not sure we

16   downloaded the phones with a Cellebrite, because the

17   video that we reviewed we pulled that video off the

18   phone.

19        Q    What about Ms. Kublick's phone, the one who

20   told you about this recording, did you do a

21   Cellebrite download on her phone?

22        A    No, we did not.

23        Q    You interviewed Ms. Kublick; is that

24   correct?

 1          A     Yes.

 2          Q     Did you ask her if she made the recording

 3    herself?

 4          A     Yes.

 5          Q     And you had a conversation with her about

 6    that; did you not?

 7          A     We did.

 8          Q     In fact, she told you that as a result of

 9    some suggestion or encouragement from Mr. Brown, she

10    was intentionally surreptitiously recording parts of

11    that evening?

12                Is that fair?

13          A     Yes.

14          Q     In fact, do you recall her telling you that

15    at one point Mr. Feiza said something to her to the

16    effect of, "Are you recording me"?

17          A     Yes, sir.

18          Q     And she said she pushed a button on the

19    phone and flipped it around to show that she was

20    playing some word game with friends or something like

21    that.

22                Do you recall that?

23          A     Yes, sir.

24          Q     Now, after she made that statement to you,

1    you watched the video?

2        A    At some point.

3            I believe I saw the video prior to that

4    occasion.

5        Q    Did you notice that the statement from

6    Mr. Feiza, "Are you recording me," is not on that

7    video?

8        A    Yes, sir.

9        Q    Did that give you concern about whether or

10   not you had the entire video?

11           Let me ask the question a different way.

12           Unless Ms. Kublick was prescient and could

13   know what was about to come out of Mr. Feiza's mouth,

14   she wouldn't know to stop that recording before he

15   asked if he was being recorded?

16           Is that fair?

17       A    Yes.

18       Q    Did you ever ask her how long was the

19   recording in terms of minutes or seconds?

20       A    I did not.

21       Q    Did you ever ask her how many copies she

22   made?

23       A    I believe we asked her, and she said that

24   she had it on her phone and that she had sent it to

1    Mr. Brown's phone.

2        Q    Did you ask her how she got it to

3    Mr. Brown's phone?

4        A    No.

5            I assume she just sent it to him in the

6    phone.

7        Q    Now, have you in your experience shared a

8    video with a friend?

9        A    Yes, sir.

10       Q    Have you in your experience had it happen

11   where the iPhone or the Galaxy or the CEO phone would

12   say the clip is too large, it needs to be chopped for

13   transmission?

14       A    I have not.

15           I don't do a lot of sharing of videos.

16       Q    That has never happened to you?

17       A    Not to me.

18       Q    Has it happened to someone else?

19       MR. CULLEN:  Objection, Your Honor.

20           Calls for speculation.

21       THE COURT:  Sustained.

22       MR. CAMIC:  I was about to say that you were

23   aware of.

24       THE COURT:  Okay.

1          You made an objection as being speculation?

2     MR. CULLEN:  Yes.

3     THE COURT:  I sustained the objection.

4 BY MR. CAMIC:

5     Q     Are you aware of it happening to someone

6 else?

7     A     Not to my knowledge.

8     Q     Did you ask her if she ever edited the

9 cellphone video?

10    A     Not that I recall.

11    Q     Is it the kind of thing you would generally

12 have asked?

13    A     In reviewing it -- and, again, I came in

14 after the beginning of this.

15    Q     Sure.

16    A     So it's not something I would have

17 necessarily gone back and asked at that point.

18    Q     Sure.

19          I understand.

20          There is some question as to whose phone

21 she was using; is there not?

22    MR. CULLEN:  Objection to the form of the

23 question, Your Honor.

24    MR. GAY:  I will ask it a different way.

1          THE COURT:  Go ahead.

2     BY MR. CAMIC:

3          Q     You read multiple statements from

4     Ms. Kublick?

5          A     I read -- from talking to her and the

6     original statements, and then the only discrepancy of

7     the phone was off the report from your investigator.

8          Q     She told the investigator and you got a

9     copy of that --

10         MR. CULLEN:  Objection.

11             Hearsay as to what Kublick told Mr. Camic's

12    investigator.

13         MR. CAMIC:  He said he read the report, but I

14    will ask Ms. Kublick.

15             That's fine.

16         THE COURT:  Okay.

17             So you are withdrawing the question?

18         MR. CAMIC:  I will withdraw the question.

19         THE COURT:  Okay.

20             Go ahead.

21    BY MR. CAMIC:

22         Q     You eventually entered a contract with

23    Mr. Brown to work off his problems with the state

24    police?

1          Is that fair?

2     A    Yes, sir.

3     Q    And he was charged with a Class X felony?

4     A    Yes, sir.

5     Q    He has been to the department of

6   corrections before?

7     A    Yes, sir.

8     Q    Do you know how many times?

9     A    Not without looking at his criminal

10  history.

11     Q    Going back to Mr. Brown's statement that he

12  had, quote, tons and tons of videos on that phone,

13  how many did you review?

14     A    Looking through the phone, there was a lot

15  of videos that are not appropriate to view, not to

16  deal with -- that were not in regard to Feiza, things

17  that he had pulled off the internet.

18          He had downloaded a lot of videos.

19     Q    We are all adults here, sir.

20     A    There was a lot of pornography on the

21  phone.

22          That's what he was referring to when he

23  made that statement.

24     Q    You have no idea how many or if that was

1    exclusive of his downloads?

2         A    When I was scrolling through, I did not

3    view those.

4              I was looking for things in regards to this

5    matter where he showed me they were.

6         Q    Did you know they were pornography by the

7    content of the video or by the title?

8         MR. CULLEN:  Objection to relevance, Judge.

9         THE COURT:  Relevance?

10        MR. CAMIC:  Judge, I want to know what followup

11   was done.

12             You can call something anything you want.

13        THE COURT:  I am going to overrule that.

14             You can answer that.

15        THE WITNESS:  You could tell from the picture.

16             You see like the beginning of the picture,

17   you could tell what it was about.

18   BY MR. CAMIC:

19        Q    Or at least you could tell what it appeared

20   to be?

21             Is that fair?

22        A    That is correct.

23        Q    Without looking at it, you couldn't tell

24   whether it's called itself or the first picture is

1     some type of pornography; and as soon as you play it,

2     it changes?

3          Is that fair?

4     A    That's fair.

5          I guess anything is possible.

6     Q    Now, when he was interviewed by you as part

7     of the contract, is it true that he admitted to

8     selling cocaine to six to ten people after the search

9     warrant was executed at his house?

10    A    Can you repeat the question, please?

11    Q    At some point, he was interviewed regarding

12    the contract you had with him; correct?

13         MR. CULLEN:  Objection as to foundation, Your

14    Honor, as to what date counsel is talking about.

15         MR. CAMIC:  Judge, I am looking at page 2281 of

16    discovery that has reference to this.

17         THE COURT:  Okay.

18         Slow down.

19         You can give as much information as you can

20    about the foundation on that.

21         MR. CAMIC:  Judge, may I approach?

22         THE COURT:  The witness?

23         MR. CAMIC:  Yes.

24         THE COURT:  Go ahead.

1          Can we get the number on that?

2          MR. CAMIC:  2281 is the SAO number.

3          I will call it Defendant's 1.

4          MR. CULLEN:  For the record, this appears to be

5     counsel's handwritten notes.

6          These are not police reports that have been

7     provided.

8          THE COURT:  What's your objection on that?

9          Are you refreshing his recollection?

10         Is that it?

11         MR. CAMIC:  Yes.

12         MR. CULLEN:  With Mr. Camic's own notes?

13         THE COURT:  Slow down.

14         Just a minute.

15         You can refresh with anything.

16         If you are refreshing his recollection with

17    that, the objection is overruled.

18         Go ahead.

19    BY MR. CAMIC:

20         Q    Have you seen this piece of paper before

21    sir?

22         A    I have not.

23         Q    Is any of that information familiar to you?

24         A    Maybe the criminal history, but everything

1 else I have never seen before.

2     Q    There is a notation at the bottom right

3 hand of this paper.

4         Can you read that to The Court?

5     MR. CULLEN:  Objection.

6         Hearsay and foundation.

7     THE COURT:  Okay.

8         You first have to indicate that his

9 recollection could be refreshed by whatever you are

10 showing him.

11         I haven't heard that.

12 BY MR. CAMIC:

13     Q    Nothing in here refreshes your recollection

14 other than the criminal history?

15     A    That is correct.

16     MR. CAMIC:  Judge, prior to the close, I would

17 like an offer of proof.

18     THE COURT:  Go ahead.

19     MR. CAMIC:  Not at this time, Judge.

20         I will do that later.

21 BY MR. CAMIC:

22     Q    I apologize, but I forgot to ask you the

23 date that the search warrant was executed?

24     A    Again, I was not prepared to answer

```
 1    questions about Mr. Brown's reports today.

 2              So I did not review them.

 3              So you would have to refresh my memory on

 4    that.

 5         MR. CAMIC:  It's going to take us a second to

 6    pull it up to give him the date.

 7         THE COURT:  Would this be in dispute,

 8    Mr. Cullen?

 9         MR. CULLEN:  I am not disputing it, Your Honor.

10         THE COURT:  I mean, it sounds as if it's

11    something that we could actually agree.

12              I don't know that we would dispute the

13    date.

14         MR. CULLEN:  I don't know offhand what date it

15    was.

16    BY MR. CAMIC:

17         Q    Was it April 12th, sir?

18         A    Sure.

19              Again, without looking at the report, it

20    sounds about right.

21              I know it was in the spring.

22         Q    In the video we have been talking about all

23    this time has a purported date on it?

24         A    Yes, sir.
```

1      Q    What date is that?

2      A    Without looking at the report, I believe

3 it's February 10th.

4      Q    At that time, Sherry Kublick and Walter

5 Brown lived together?

6      A    Yes, sir.

7      Q    What was their relationship?

8      A    It depends who you ask.

9      MR. CULLEN:  I am going to object.

10      It calls for hearsay and speculation, Your

11 Honor.

12     THE COURT:  Response?

13     MR. CAMIC:  Nothing at this time.

14     THE COURT:  Are you done?

15     MR. CAMIC:  Yes.

16     THE COURT:  Go ahead, State.

17

18               CROSS-EXAMINATION

19 BY MR. CULLEN:

20      Q    Thank you, Your Honor.

21      To get the chronology, before the search

22 warrant that was executed on April 12th of 2019,

23 Sherry Kublick had provided information to other

24 investigators with the arresting agency; correct?

 1     A     Originally, correct.

 2     Q     And it is your understanding that she

 3  showed them a video which she had taken; is that

 4  correct?

 5     A     Yes, sir.

 6     Q     But you weren't there when that happened;

 7  correct?

 8     A     That is correct.

 9     Q     It is your understanding that those other

10  officers downloaded that video; is that correct?

11     A     Yes, sir.

12     Q     And you later saw the video that was

13  downloaded?

14     A     Yes, sir.

15     Q     And that is the same video that Brown

16  showed you when he was arrested; correct?

17     A     Yes, sir.

18     Q     Brown told you that Sherry recorded that

19  video and sent it to him; correct?

20     A     That is correct.

21

22     Q     So we are talking about the same video that

23  came into the hands of the state police from two

24  different sources?

1     Is that your understanding?

2  A  Yes, sir.

3  Q  Now, when you interviewed Brown, he said he

4 had tons and tons of videos on his phone; correct?

5  A  That is correct.

6  Q  But he told you he had one video of the

7 defendant; correct?

8  A  Correct.

9  Q  And that's the one he got from Sherry

10 Kublick?

11  A  Correct.

12  Q  So when he said there's tons and tons of

13 videos, that is in the context of how am I going to

14 find the one that is relevant to the case?

15     Is that your understanding?

16  A  Yes, sir.

17  Q  He never led you to believe that he had

18 more than one video of the defendant; correct?

19  A  That is correct.

20  MR. CULLEN:  I don't have any further questions.

21  THE COURT:  Anything based on that, Mr. Camic?

22  MR. CAMIC:  One second.

23

24

1

2                    REDIRECT EXAMINATION

3    BY MR. CAMIC:

4        Q    When you answered the question a little bit

5    ago, you said the two videos you saw were identical,

6    one from Mr. Brown's phone and one from Ms. Kublick's

7    phone?

8        A    From my recollection, there was no

9    difference.

10       Q    You can't know for sure without a forensic

11   test?

12            Isn't that fair?

13       A    Or if there is a copy of the original video

14   and looking at the two.

15       Q    You don't have a copy of the original, do

16   you?

17       A    Not with me today.

18            I would have to check hers in the case

19   file.

20       Q    And even then you wouldn't know if it's the

21   original or not, would you?

22       A    I would assume if it's in the case file it

23   would be the original.

24       Q    Without a Cellebrite download, you can't be

1    sure?

2              Is that fair?

3        A    I could talk to Sergeant Burk and see if

4    that's the one he put in.

5        Q    So the answer is no, you can't be sure?

6        A    I can't be sure.

7              Sergeant Burk might know.

8        Q    But you can't?

9        A    I can't.

10        MR. CAMIC:  Thank you, Judge.

11              Nothing further.

12        THE COURT:  Anything based on that, Mr. Cullen?

13

14                   RECROSS-EXAMINATION

15    BY MR. CULLEN:

16        Q    Do you have any information that -- I will

17    withdraw that.

18        THE COURT:  Nothing?

19        MR. CULLEN:  No.

20        THE COURT:  Okay.

21              This witness is done.

22              Can he leave the building?

23        MR. CAMIC:  That's fine with us.

24        THE COURT:  It's okay?

1        MR. CULLEN:  Yes.

2        THE COURT:  All right.

3            You are done from here.

4            You can leave the billing.

5        THE WITNESS:  Thank you, Your Honor.

6                    (Witness excused.)

7        THE COURT:  Have you got another witness to

8    call?

9        MR. CAMIC:  We will call Ms. Kublick.

10       THE COURT:  Please approach the clerk and raise

11   your right hand to be sworn.

12                   (Witness sworn.)

13       THE COURT:  The bailiff is going to point you to

14   the seat over there.

15           In front of you on the table when you sit

16   down is a metal item.

17           That's a microphone.

18           Get close to that without touching it,

19   please.

20           Let's talk about the mask for a minute.

21           For the record, the witness is masked, as

22   is the court reporter and I and most everybody in

23   here.

24           The court reporter is within six feet of

 1     you, but there is a screen in between the two of you.

 2          Sometimes we can't understand what people

 3     are saying with masks on.

 4          I may ask you to take it off.

 5          Is that all right with you?

 6     THE WITNESS:  Yes.

 7          That's fine.

 8     THE COURT:  Okay.

 9          Go ahead.

10

11                    SHERRY KUBLICK,

12     called as a witness herein, having been first duly

13     sworn, was examined and testified as follows:

14                    DIRECT EXAMINATION

15     BY MR. JOHNSON:

16          Q     Would you state your name, please.

17          A     Sherry Kublick.

18          Q     That is spelled K-u-b-l-i-c-k?

19          A     Yes.

20          Q     S-h-e-r-r-y?

21          A     Correct.

22          Q     Do you know a fellow by the name of Walter

23     Brown?

24          A     Yes.

```
1        Q     What is your relationship with him right
2    now?
3        A     There isn't a relationship with him.
4        Q     Are you friends with him?
5        A     No.
6        Q     Did you live with Walter Brown at one time?
7        A     Yes.
8        Q     Do you know -- as close as you can, can you
9    tell us the dates you lived with him?
10       A     Oh, boy.
11       Q     As close as you can.
12       A     Well, I know when I left.
13       Q     What date did you leave?
14       A     Which would have been like February of last
15   year, 2019, I guess.
16       Q     We are in '21 right now.
17       A     It was in -- I'm sorry, March.
18             Right around in March, I think.
19       Q     I want to make sure I got the date right.
20             You left in March of --
21       A     I have been living at the residence I am in
22   right now for a year and four months or five months
23   now.
24       Q     I want to backtrack and get this right.
```

1          When did you stop living with Walter Brown?

2          If you can give a month and a year, that

3 would be terrific.

4      A    I can't.

5          I can't even recall when I left there.

6          That was when all the chaos was going on.

7      Q    Do you remember -- let's use an anchor

8 date.

9          Do you remember videotaping Aaron Feiza?

10      A    Yes.

11      Q    Does the date February 10th, 2019, ring a

12 bell as being accurate for that date?

13      A    Yes.

14      Q    Okay.

15          How much longer after that did you live

16 with him?

17      A    Just a couple of months.

18      Q    Just a couple of months?

19      A    Yes.

20      Q    And how much time before that did you

21 live with him?

22      A    A little over a year.

23          I couldn't give you a precise month.

24      Q    When you were living with him, what was the

```
1    address you lived at?

2         A    615 Center Street, Maple Park.

3         Q    I take it that's in Illinois, Kane County?

4         A    Correct, Maple Park, Illinois.

5         Q    I'm sorry?

6         A    Yeah, Maple Park, Illinois.

7         Q    And when you were living with him there,

8    was that an intimate relationship or just a roommate

9    relationship?

10        A    We had had an intimate relationship for

11   some time, and it became not intimate anymore.

12             So then it became a tenant type of

13   situation.

14        Q    Did it become a tenant type of situation

15   after the February 10th, 2019 date we --

16        A    Yes.

17        Q    -- referred to?

18        A    Yes.

19        Q    Okay.

20             And if you wait for me to finish my

21   question, it will be easier for the court reporter.

22        A    I'm sorry.

23        Q    That's okay.

24             And, now, drawing your attention to the
```

```
 1    February 10th date, do you remember being -- February
 2    10th, 2019, do you remember being with Walter Brown
 3    that night?
 4              And when I say that night, let's go back to
 5    the 9th, the evening of the 9th of February.
 6              Do you remember that?
 7         A    Yes.
 8         Q    And where were you?
 9         A    In the basement of the house.
10         Q    I am talking about on the 9th.
11              Were you with Walter Brown and Aaron Feiza
12    at any place on the 9th?
13              Do you remember?
14         A    That day we went to the American Legion.
15              That's the first time I had ever met Aaron
16    Feiza.
17         Q    You were at the American Legion the night
18    before the 10th; is that right?
19         A    Correct.
20         Q    And where did you go after the American
21    Legion?
22         A    To his brother's house.
23         Q    That would be Derek Feiza's house?
24         A    Derek Feiza, correct.
```

```
 1       Q     And you knew Derek?

 2       A     Yes.

 3       Q     So even though you just met Aaron for the

 4  first time, you knew Derek before that?

 5       A     Correct.

 6       Q     And then at some point in time past the

 7  midnight hours making it February the 10th, 2019, did

 8  you go to your house with Mr. Brown?

 9       A     Yes.

10       Q     When you say it was a landlord/tenant

11  situation, you later on became the tenant?

12             This was Mr. Brown's house; is that right?

13       A     That is correct.

14       Q     Did he own it or rent it?

15       A     He owned it.

16       Q     And on the 10th, did he ask you -- were

17  people doing drugs at the house?

18       A     Yes.

19       Q     And when these people were doing drugs, how

20  did you know that it was drugs that they were

21  ingesting?

22             What did you see, or what caused you to

23  believe that?

24       A     Because Walter had done cocaine on previous
```

```
1    occasions several times.

2        Q    Walter was a -- Walter Brown was a heavy

3    cocaine user; is that correct?

4        A    That is correct.

5        Q    He used it on a regular basis?

6        A    Yes.

7        Q    Did he use it on a daily basis?

8        A    Yes.

9        Q    And with regard to February the 10th, 2019,

10   he was basically in the middle of that daily basis of

11   using cocaine; is that right?

12       A    Yes, that is correct.

13       Q    You used cocaine that night, too, didn't

14   you?

15       A    Yes.

16       Q    And how often back during those days would

17   you use cocaine?

18       A    Not as often as him.

19            That's for sure.

20       Q    He was daily.

21            How would you characterize your cocaine

22   usage?

23       A    Probably every weekend.

24            Maybe sometimes twice a week.
```

1      Q      And would you -- have you ever, say, for
2   example, gone to counseling for cocaine use?
3      A      No.
4      Q      So you never considered yourself addicted
5   to the drug?
6      A      No.
7      Q      Did you do any other drugs with Mr. Brown?
8      A      No.
9      Q      Just cocaine?
10     A      Correct.
11     Q      Now, when Mr. Brown on February the 10th
12  brought out the cocaine, did you see him bring it
13  out?
14     A      Yes.
15     Q      What did he have it in?
16     A      He had cocaine in several different things.
17            That night I think he had it in some little
18  yellow thing he kept it in.
19            He put it on a red plate.
20            They always used a red plate.
21     Q      When you say he always used the red plate,
22  before February 10th, 2019, he would often use that
23  red plate to ingest cocaine; is that right?
24     A      Yes.

1      Q    And after February 10th, 2019, he would

2   continue to use that red plate to ingest cocaine?

3      A    Yes.

4      Q    Would you as well?

5      A    Yes.

6      Q    Now, on February the 10th, 2019, when he

7   brought out cocaine, was it in that what you said a

8   yellow container of some kind?

9      A    I believe so.

10          He had several different ones.

11          It could have been -- I mean, I don't want

12   to say for sure what container it was in; but I think

13   it was in the yellow one.

14      Q    All right.

15          Is that like a Tupperware thing or a baggy

16   or what?

17      A    He had like little silver things that you

18   could screw looked like a bulb he had some things in.

19          He had several containers.

20          He had a little silver one that had a screw

21   top on it that he kept it in.

22          Then he had -- the yellow one was plastic,

23   and it screwed off the top.

24      Q    This is the morning you did the video; is

1   that correct?

2        A    That is correct.

3        Q    Now, when the cocaine made its way to the

4   plate, did you see Mr. Brown put the cocaine on the

5   red plate?

6        A    Yes.

7        Q    Did you see him put it on the red plate

8   more than one time?

9        A    That night?

10       Q    Yes.

11       A    Yes.

12       Q    Or did he just put it on once, and that

13  lasted the whole morning or night?

14       A    No.

15            He put it on a couple of times.

16       Q    Did you see him each and every time he did

17  it?

18       A    No.

19       Q    So there were times that a substance made

20  its way to that plate where you didn't see how it got

21  there; is that correct?

22       A    That is correct.

23       Q    Did you see Mr. Feiza, the defendant in

24  this case, at the bar near that red plate?

1      A     Yes.

2      Q     Is Mr. Feiza the gentleman seated behind me

3   with the blue shirt and the tie and the sport coat

4   on?

5      A     Yes.

6      Q     You saw him at the bar; right?

7      A     Yes.

8      Q     And you saw him ingest some things off of

9   that plate; correct?

10      A     Correct.

11      Q     And prior to him ingesting that, did you

12   make a decision to video and audio record that off of

13   your phone?

14      A     Yes.

15      Q     Was it an iPhone or some other kind?

16      A     Yes, I think it was an iPhone.

17      Q     In any event, it had video and audio

18   recording; correct?

19      A     That is correct.

20      Q     Who owned that phone?

21      A     I did.

22      Q     And who -- do you remember, by the way,

23   speaking to our investigator last night?

24      A     Yes.

1      Q      I'm sorry, on the 16th, on May the 16th.

2      A      Yes.

3      Q      His name was Jason Harvey?

4      A      I don't recall if he said what his name

5   was.

6      Q      He is a big guy?

7      A      Yes.

8      Q      Did you say to him that that was Walter

9   Brown's phone that you used to record?

10      A      No. I said Walter Brown's phone had other

11   videos of stuff.

12      Q      Other videos of what?

13      A      Other videos of things he had recorded, not

14   necessarily about Aaron Feiza but other videos.

15             And your investigator was asking me

16   questions in front of an individual that knows

17   nothing about this whole business.

18             So I could not be -- I couldn't share a lot

19   of things.

20      Q      You didn't feel you could be as forthcoming

21   as you would want to have been because there was

22   another person listening in on this conversation?

23      A      That is correct.

24             I didn't want to share all the information.

```
 1        Q     In any event, at some point in time, you

 2    saw Mr. Feiza, the defendant you just pointed out,

 3    you thought he was about to ingest something that was

 4    on that plate; is that correct?

 5        A     That is correct.

 6        Q     You thought it was cocaine; right?

 7        A     That is correct.

 8        Q     Now, prior to that, you said you hadn't

 9    seen each and every time Mr. Brown placed the cocaine

10    into that red plate.

11              Prior to Mr. Feiza ingesting what was on

12    the plate, did you see that transfer of cocaine from

13    Brown to the red plate or not?

14        A     Prior to Aaron Feiza doing it?

15        Q     Right.

16        A     Yes.

17        Q     You actually remember that?

18        A     I remember him putting it on the plate.

19              He was right in front of me.

20        Q     But do you remember --

21        A     I said not every time but the first time,

22    yes.

23        Q     And that was the first time?

24        A     Yes.
```

1          Q      When you recorded it?

2          A      (Nodding.)   Yes.

3          Q      At that point in time then, you decided to

4   get your camera out and surreptitiously record that;

5   is that correct?

6          A      That is correct.

7          Q      Did you know that when you were doing that

8   that that was against the law?

9          A      No, I did not.

10         Q      So you thought you were legally on okay

11  footing doing it; is that right?

12         A      That is correct.

13         Q      Since that -- so you recorded it video and

14  audio; is that right?

15         A      That is correct.

16         Q      Do you remember how long approximately that

17  recording was?

18         A      I don't, but your investigator asked me the

19  same thing.

20                There is no way to know that.

21         Q      Do you -- when is the last time you saw

22  that recording?

23         A      The last time I came here to court, which

24  was over a year ago.

1          How long ago has it been?

2          I don't know.

3     Q     So did you see -- did the prosecutor show

4   it to you?

5     A     Yes.

6     Q     Did it look to be the same recording as you

7   made that day on February 10th, 2019?

8     A     Yes.

9     Q     Now, you indicated at some point in time

10   that during -- while you were recording -- I think

11   it's one of the police reports.

12          While you were recording, you heard Aaron

13   Feiza, the defendant, say something to the effect,

14   "Are you recording me?"  And then you kind of

15   switched it off and turned over to a War With Friends

16   game to try to cover it up.

17          Do you remember him saying that while you

18   were recording?

19     A     That wasn't that recording.

20          That was a prior one.

21          I had little snip-its of videos prior to

22   that, and then there was that one.

23     Q     Snip-its of video of what?

24     A     Because I couldn't hold the phone up to

1    blatantly stick it up there.

2            So I had it down; and, obviously, I started

3    to lift it, and he said that to me.

4            So I dropped the phone back down.

5            That video is not what was sent to Walter's

6    phone and Walter then turned it in here.

7        Q    I am a little bit lost on this thing.

8            Prior to the video that you took that

9    allegedly shows Mr. Feiza snorting a substance out of

10   a red plate or a ceramic red plate --

11       A    That video was later.

12       Q    That was later on February 10th, 2019?

13       A    Correct.

14       Q    But earlier on February 10th, 2019, you

15   were recording him as well?

16       A    I tried two times.

17           They were very short little like two

18   seconds, and I put it back down.

19       Q    And on one of those is the time where he

20   indicated to you that he was -- he thought you were

21   recording him or at least asked you that, and you

22   turned it off and showed him a War With Friends you

23   were supposedly playing?

24       A    Correct.

1        Q     What did Aaron say when he accused you of

2    video -- or audio taping him?

3              Do you remember exactly what he said?

4        A     I don't recall.

5        Q     Can you give us your best recollection of

6    it?

7        A     He just said it looks like you are

8    recording me or something like that.

9        Q     When you showed him the Words With Game

10   sort of ruse, did he buy that or did he appear to buy

11   it?

12       A     Yes.

13       Q     How many of those little snip-its -- you

14   said there were two or --

15       A     There were two prior to the one that has

16   him snorting the substance.

17       Q     After Mr. Feiza snorted that substance,

18   what happened after that?

19       A     Then we all sat there and chatted.

20       Q     Was there more -- were there more incidents

21   of cocaine usage?

22       A     Yes.

23       Q     Did you use some cocaine?

24       A     Yes.

1   Q Did Mr. Feiza use more what you thought was

2 cocaine?

3   A Yes.

4   Q And on each and every incident that

5 Mr. Feiza snorted out of that, prior to that you saw

6 Walter Brown pour what you thought to be cocaine in

7 that bowl?

8   A That is correct.

9   Q But you didn't see every time?

10   A Obviously not if I went to the restroom.

11     There could have been more put on it then.

12     I have no idea.

13     I didn't see every time.

14   Q Did you ever video or audiotape Aaron Feiza

15 at any time other than those occasions you have just

16 testified to on February 10th, 2019?

17   A No.

18   Q Is the plate that was used, is it called a

19 cocaine plate?

20     Is that sort of a nickname that you gave

21 it?

22     A party plate?

23   A No.

24     It was just a red plate.

1          No, there was no nickname.

2     Q    At some point in time, you called the

3     police or became an informant for the police; is that

4     correct?

5     A    I was involved in a situation.

6          Yes, I did.

7     Q    And that was with regard to your then

8     roommate -- or, I'm sorry, your landlord, Walter

9     Brown?

10    A    That is correct.

11    Q    You no longer had the intimate

12    relationship?

13         You were a tenant, and you became a

14    confidential source?

15    A    That is correct.

16    Q    As a confidential source, you provided

17    information to the police -- I am not sure which

18    police -- Illinois State Police I suppose, that

19    Mr. Brown was dealing cocaine out of the house; is

20    that correct?

21    A    That is correct.

22    Q    All right.

23         Now, going back to the February 10th date

24    where you video and audio recorded Mr. Brown -- I'm

     1     sorry, Mr. Feiza, did you do that to protect yourself

     2     in the future or to protect somebody else?

     3          A     I mean, I did it for myself.

     4                To protect myself, yes.

     5          Q     Why protect yourself?

     6                What were you worried about?

     7                What did you need protection for?

     8          A     I was in a situation.

     9                Walter Brown is a very physically and

    10     verbally abusive individual.

    11                I was put in a position where I felt I

    12     could not leave without my life being threatened.

    13                I took several videos of Walter, not of

    14     Aaron Feiza, of Walter Brown on several occasions

    15     prior to that for that purpose should I ever need it.

    16          Q     Do you remember testifying in front of the

    17     grand jury in this case?

    18          A     Yes, I do.

    19          Q     When you testified in front of the grand

    20     jury, it was February -- I'm sorry, December 3rd,

    21     2019, here connected to the state's attorney's

    22     office.

    23                Do you remember that?

    24          A     Yes.

```
 1      Q    Do you remember being asked the following
 2   questions and answering them in this way:
 3           Page 38:
 4           Q.
 5           Well, when you recorded -- when you
 6   recorded it, was that the first line of cocaine he
 7   did that night, or had he already been doing cocaine?
 8           That's referring to Mr. Feiza.
 9           Your answer, He had been doing it.
10           So that was not the first line of cocaine,
11   was it?
12      A    Okay.
13           Well, it's fuzzy.
14           It's been a long time ago.
15           I don't really recall.
16      Q    Just a moment ago you said you remembered
17   specifically that --
18      A    You asked me if --
19      THE COURT:  Hold on.
20           Hold on.
21           Let him ask the question, and then you can
22   answer.
23           If you are talking at the same time, she
24   can't take it down.
```

1                    Go ahead, Mr. Johnson.

2       BY MR. JOHNSON:

3            Q    You said just a moment ago you remembered

4       that you saw Mr. Brown provide that cocaine to that

5       red bowl, and you actually saw that because it was

6       the first line that Mr. Feiza, Aaron Feiza, did.

7                    Do you remember that testimony just minutes

8       ago?

9            A    Okay.

10                   Yes.

11           Q    And you said something different in front

12      of the grand jury.

13                   Do you acknowledge that now?

14           A    I acknowledge it, yes.

15           Q    So that might not have been the first line;

16      right?

17           A    It might not have been.

18           Q    So does that refresh your recollection that

19      you have no idea whether that was his first line or

20      some other line?

21           A    I would agree.

22           Q    And then the question was:

23                   So you were watching him use cocaine, and

24      then you decided to record this ongoing activity?

1          And your answer:

2          That is correct.

3          Do you remember giving that answer to the

4   question?

5     A   Yes.

6     Q   Do you remember a grand juror asking the

7   question saying:

8          So you were trying to protect yourself as

9   well?

10         And you said:

11         Yes, because I knew he was a cop.

12         Right?

13    A   Okay.

14        Yes.

15    Q   And knowing he was a cop and if that was

16  cocaine, that would maybe make him a dirty cop;

17  right?

18    A   Yes.

19    Q   And when you said that, you were talking

20  about using Mr. Feiza as a bargaining chip, weren't

21  you?

22    A   No.

23    Q   What were you referring to with that

24  statement?

1      A     I -- again, it was more about Walter Brown

2    than it was Aaron Feiza.

3           Walter doing drugs with a cop made it --

4    made me feel like I had more --

5      Q     As a bargaining chip?

6      A     I don't know what bargaining chip means.

7      Q     In case you got in trouble, you had

8    information for the police that could take whatever

9    heat you brought on yourself off of you?

10     A     No.

11          It was so if Walter tried to do anything to

12   me, I would have that stuff.

13          Or if I disappeared, I would have that on

14   my phone to show all the dirty things he was doing.

15     Q     You also did it to protect Mr. Brown, too,

16   didn't you?

17     A     No.

18     Q     Mr. Brown asked you to take that recording,

19   didn't he?

20     A     The next day he said he wished he had had a

21   video of that so should Aaron ever do anything to him

22   he would have that as leverage, and then I sent him

23   that video from my phone.

24     Q     So you are saying you did it without his

1  knowledge?

2      A    That is correct.

3           I sent that video to Walter's phone the --

4      THE COURT:  Wait until there is a question,

5  please.

6           Wait until they ask a question.

7  BY MR. JOHNSON:

8      Q    Again, drawing your attention to the May

9  16th conversation you had with Jason Harvey, our

10 investigator, did you tell Jason Harvey that

11 Mr. Brown asked you to video Mr. Feiza?

12     A    I told him that the next day Walter said he

13 wished he had had a video or we could get one, and

14 then I transferred it to him.

15          But I did not tell him that it was Walter's

16 phone.

17          It was my phone, and it got transferred to

18 Walter's phone.

19     Q    Did you tell Mr. Harvey that it was at the

20 request of Mr. Brown that you made the recording?

21     A    At the request of Walter?

22     Q    Right.

23     A    No.

24     Q    You said a minute ago that there were

1   snip-its that were separate and apart from the video

2   showing Mr. Feiza ingesting some material; right?

3       A    I didn't get him on the first couple of

4   snip-its snorting anything.

5       Q    I am not asking that.

6            There are two separate snip-its from the

7   one of Mr. Brown (sic) ingesting the substance; is

8   that correct?

9       A    Correct.

10      Q    And do you still have those recordings?

11      A    No.

12      Q    Did you give them to anybody?

13      A    The police had the video of him.

14      Q    I am talking about the snip-its.

15      A    No.

16           Those were all deleted.

17           Everything is deleted.

18      Q    When did you delete the snip-its?

19      A    Right after Walter got the video, I deleted

20  all that.

21           And after I talked to Jeff -- I don't know

22  his last name.

23      Q    After you talked to who?

24      A    The state police.

1       Q       You talked to the state police for what

2     reason?

3       A       And they downloaded that off my phone, the

4     video.

5       Q       The main video or the snip-its?

6       A       The main video.

7       Q       Did you say to the state police officer,

8     hey, I have got a couple of other ones here, too?

9       A       No.

10      Q       And you decided to go out of your way to

11    delete those snip-its; is that correct?

12      A       I deleted everything off my phone.

13      Q       Do you remember testifying to the grand

14    jury on December 3rd, 2019, and also being asked this

15    question by the prosecutor, who I think was

16    Mr. Cullen:

17              Did you video record anyone?

18              And your answer was:

19              Yes, I did.

20              Question -- it's on page 34.

21              I'm sorry.

22              Question:

23              Can you explain how that came about?

24              Answer:

1          I, um, had my cell phone.

2          I was playing a game on it, a word game

3     called Words With friends, and I just switched over

4     to my camera with a video, and it was like two little

5     screens on my phone, and I just -- when he had the

6     plate, I just held the phone up and videoed it, and

7     then he happened to look up at me and he is like, Are

8     you recording me, jokingly?

9          And I just flipped the phone around and

10    just touched my screen, and it flips back to the

11    game.

12         So it made it look like I was just  playing

13    my game.

14         Would you agree with me that a fair reading

15    of that is that conversation or that accusation

16    against you of you recording him was during the main

17    video?

18         Doesn't it sound like that from that

19    testimony?

20    MR. CULLEN:  I am going to object to the form of

21    the question, what it sounds like.

22         The question speaks for itself.

23    THE COURT:  I am going to ask the witness to go

24    out in the hallway, please.

1          And when you are out there, don't talk to

2     anybody, any lawyers or anybody about what your

3     testimony is or what they are asking you.

4          The record should reflect the witness has

5     left the stand, and the door is closed in the

6     courtroom.

7          State your objection, Mr. Cullen.

8     MR. CULLEN:  Counsel is asking her to agree that

9     it -- what it sounds like it means.

10         She said that that's what she said.

11         It speaks for itself.

12    THE COURT:  So your objection is what?

13    MR. CULLEN:  The question, him asking her what

14    it sounds like that means.

15    THE COURT:  So it's an improper question?

16    MR. CULLEN:  Yes.

17    THE COURT:  Response, Counsel?

18    MR. JOHNSON:  Well, Your Honor, I am going to

19    concede that -- I think it sounds like it means she

20    is talking about the main video.

21         It's a little bit vague.

22         I am just asking her for --

23    THE COURT:  I have been having another problem

24    with this.

1          This is your witness, which you basically

2    impeached about ten times with previous inconsistent

3    statements.

4          There was no objection on it.

5          I am a little concerned about that, you

6    impeaching your own witness.

7          Do you want to respond to that?

8        MR. JOHNSON:  Yes, Your Honor.

9          We are trying to show that she basically --

10   this goes to, first of all, to the first motion in

11   limine with regard to the substance and the plate.

12         But it also goes to the motion to suppress,

13   because it's an illegal recording.

14       THE COURT:  I get that.

15         The impact of you impeaching your own

16   witness, do you believe that that's substantive

17   evidence then?

18       MR. JOHNSON:  If we can get her to -- well,

19   first of all, if it's recorded in some way, it is.

20         If we can get her to admit that she did it,

21   it also is.

22       THE COURT:  So, obviously, when you call a

23   witness, you vouch for their credibility.

24         What you are talking about is calling a

1    hostile witness, the witness contrary to your

2    interest.

3         MR. JOHNSON:  I believe hostile witness allows

4    us to cross-examine.

5         THE COURT:  Impeaching your own witness is a

6    little bit different.

7              There is a way you can impeach witnesses

8    and get substantive evidence out of that, which is I

9    don't think available to you if you are impeaching

10   your own witness.

11             Are you following me on this?

12        MR. JOHNSON:  I follow you.

13             I don't agree with that, but I do follow

14   you.

15        THE COURT:  I believe that would be the case for

16   you to be able -- I don't want to get into that whole

17   thing now.

18             But, in any event, you have been impeaching

19   your own witness in this matter to obtain the

20   information you want.

21             I am concerned about the form of the

22   question that you asked, but I am also concerned

23   about impeaching your own witness in this matter.

24             So explain to me what you are trying to get

1   from her out of that is that she believes -- you know

2   what, I am going to ask Debbie Schweer to read that

3   question back before Mr. Cullen's objection.

4                    (Record read by the reporter.)

5       THE COURT:  That sounds like the questions you

6   are asking me.

7            So you are asking her if what she testified

8   sounded like something else?

9       MR. JOHNSON:  Right.

10      THE COURT:  And your objection then -- can you

11  be a little more specific why do you think that's

12  objectionable?

13      MR. CULLEN:  He is asking her what the answer

14  sounds like when, in fact, the answer speaks for

15  itself.

16      THE COURT:  Well, I think this is very much more

17  like cross-examination than it is direct examination,

18  obviously, and asking somebody if their opinion about

19  a certain occurrence that happened could have a

20  different perspective.

21           I guess that would be a proper question

22  about this.

23           I just want to make this clear.

24           If you are impeaching your own witness, you

1    have to be able to -- and there is case law.

2              I thought I had it here.

3              There is case law to indicate you have to

4    be able to establish that this somehow basically guts

5    your case before this can be determined to be --

6    because this mostly happens with the State.

7              This would have to very seriously affect

8    your case, which I guess would be your defense,

9    before any of this can be substantive.

10             What I am trying to make sure I understand

11   is that I don't know that any of this is substantive

12   at this point.

13             You are eliciting information, which

14   obviously is of the record.

15             It may be none of this is substantive.

16             I mean, if you want to use that

17   substantively, we would have to have a hearing about

18   that, because I think there is some issues about that

19   before going forward.

20             So there is where we are.

21             I am going to overrule the objection.

22             We will talk about this at another date I

23   would think in the future about what the substantive

24   content of what she -- some of the things she has

1    testified would be.

2             Anything else, Mr. Cullen?

3        MR. CULLEN:  Well, I guess that was my

4    objection.

5             I am not going to -- I just made the

6    objection, Your Honor.

7             You overruled it.

8        THE COURT:  Okay.

9             I understand.

10            I am just going to ask you so we don't have

11   to get her out again if there is another objection.

12       MR. CULLEN:  I don't think she is done

13   testifying.

14       THE COURT:  Excuse me?

15       MR. CULLEN:  I don't think she is done

16   testifying.

17       THE COURT:  No.

18       MR. JOHNSON:  I don't have any further

19   questions.

20       THE COURT:  I don't want to send her out again

21   is what I am saying if you have another objection.

22       MR. CULLEN:  No, Judge.

23       THE COURT:  Bring her back?

24       MR. JOHNSON:  Yes, sir.

1    THE COURT:  Okay.

2         Bring her back, please.

3    MR. GAY:  Yes, sir.

4    THE COURT:  Take the witness chair again.

5         Did you speak to anybody out there?

6    THE WITNESS:  The officer right here.

7         He just said hi to me.

8    THE COURT:  Right where?

9         You mean outside?

10   THE WITNESS:  He thought I was finished.

11   THE COURT:  Did he ask you about your testimony

12   or anything like that?

13   THE WITNESS:  No.

14   THE COURT:  Take a seat.

15        Go ahead.

16        I overruled the objection.

17   BY MR. JOHNSON:

18   Q    I just have a handful of questions.

19        I am going to withdraw that question, and I

20   am going to ask the following question -- and I am

21   pretty close to being done.

22        While you were recording that night, were

23   you feeling the effects of the cocaine you ingested?

24   A    I am sure I was.

1      Q    I am not asking if you are sure.

2      A    Yes.

3           I mean, to be honest, cocaine was in my

4      system.

5      Q    Do you remember how you felt?

6      A    It just speeds up your metabolism.

7      Q    Okay.

8           Anything else?

9      A    No.

10     MR. JOHNSON:  I have nothing further.

11          Thank you.

12     THE COURT:  Cross-examination.

13          Go ahead.

14     MR. CULLEN:  Thank you, Your Honor.

15

16                    CROSS-EXAMINATION

17     BY MR. CULLEN:

18     Q    At Walter Brown's house that night, you did

19     cocaine more than one time; is that correct?

20     A    That is correct.

21     Q    Approximately how many times did you do

22     cocaine?

23     A    I would say maybe three.

24     Q    I am having a hard time hearing you.

1          About three?

2     A    About three, three or four probably little,

3     little lines, yes.

4     Q    And was the defendant, Aaron Feiza, at the

5     table where you were doing those three lines of

6     cocaine?

7     A    We were all sitting at a bar, yes.

8     Q    At a bar?

9     A    Yes.

10    Q    And the cocaine went down the line, and

11    each person there snorted some of it?

12    A    That is correct.

13    Q    And, so, each time you snorted cocaine, did

14    the defendant snort cocaine from the same pile on the

15    plate?

16    A    They were -- Walter put them in lines, some

17    of them shorter because I couldn't do it like that,

18    and some of them longer for people that are used to

19    it.

20    Q    But they all came from the same cocaine

21    that Walter Brown poured on the plate?

22    A    That is correct.

23    Q    And each time that you snorted that

24    cocaine, did you get the experience you are familiar

1    with from snorting cocaine?

2        A   Yes.

3        Q   So was that cocaine that you snorted?

4        A   Yes.

5        Q   And each time that you snorted those lines,

6    Aaron Feiza was also snorting from that same cocaine

7    on the plate, the same pile of cocaine?

8        A   Yes.

9        Q   That had been divided into lines?

10       A   Yes.

11       Q   Now, when you recorded the defendant, you

12    said you took two short snip-its; is that correct?

13       A   That is correct.

14       Q   And that was when you were trying to record

15    him, but they were short -- why were they only short

16    snip-its?

17       A   Because I couldn't lift the camera up and

18    be blatant about it.

19           Like it was just showing the bar and like

20    part of behind the bar.

21           So I put it back down and shut it back off.

22       Q   Did those show anything that appeared to be

23    relevant to anything?

24       A   That's correct.

1           Q     The answer would be no?

2           A     It didn't show anything.

3                 That is correct.

4           Q     So you deleted those because they didn't

5     show anything relevant?

6                 Is that what you are saying?

7           A     Yes, that's what I am saying.

8           Q     It's extremely easy to delete an video or a

9     photograph off of your phone; is that correct?

10          A     Yes, that is correct.

11          Q     Now, the video that did show something, was

12    that -- was there only one video that showed the

13    defendant snorting what appeared to be cocaine?

14          A     Yes.

15          Q     And you forwarded that to Mr. Brown the

16    next day?

17          A     That's correct.

18          Q     And you showed that same video to the

19    police later when you were becoming an informant?

20          A     That's correct.

21          Q     And were you shown that same video when you

22    testified at the grand jury?

23          A     Yes.

24          Q     And what you were shown at the grand jury,

1      was that a true and accurate copy of what you

2      videotaped on February 10th of 2019?

3            A     Yes.

4            Q     And what you saw at the grand jury, was

5      that the whole video that you had of the defendant

6      snorting what appeared to be cocaine?

7            A     Yes.

8            Q     Did you do anything to edit the video you

9      made of the defendant snorting cocaine?

10           A     No.

11           Q     Do you have any other copies or any other

12     videos of the defendant doing anything?

13           A     No.

14           Q     Now, you testified that a couple of days

15     ago an investigator came to talk to you?

16           A     Yes.

17           Q     He came to your house to serve you a

18     subpoena; is that correct?

19           A     That is correct, from the defense attorney.

20           Q     And then he struck up a general

21     conversation about what happened?

22           A     Yes.

23           Q     Did he say that he was interviewing you

24     about the case?

```
1        A    No.

2        Q    Was he taking notes during that?

3        A    No.

4        Q    Did he ask you to record -- if he could

5   record that?

6        A    No.

7        Q    Did he ask you how long the video was that

8   you recorded of the defendant snorting cocaine?

9        A    Yes, he asked me.

10       Q    What did you tell him?

11       A    I told him I had no idea.

12            There is no way I would know that, because

13   it could be anywhere from 30 seconds to three

14   minutes.

15            It was a very short video, very short.

16            So there is no way to know that.

17            It's been a long time ago.

18       Q    And the grand jury that you testified was

19   November 19th of 2019; correct?

20       A    Yes.

21       Q    I'm sorry, that was December 3rd of 2019;

22   correct?

23       A    Correct.

24       Q    And was that the last time you saw that
```

1   video?

2       A   Yes.

3       Q   Did you ever tell the defendant's

4   investigator that you had recorded Aaron Feiza other

5   than that day?

6       A   No.

7       Q   Did you tell him that you had recorded

8   Brown on other occasions?

9       A   Yes.

10      Q   That was as you testified earlier on direct

11  examination?

12      A   Correct.

13      MR. CULLEN:  I would like to show the witness

14  what I have marked People's Exhibit 1.

15      THE COURT:  Which is what?

16      MR. CULLEN:  It's the video that she testified

17  to at the grand jury.

18      THE COURT:  Any objection?

19      MR. JOHNSON:  No, sir.

20      THE COURT:  Go ahead.

21      MR. CULLEN:  I am going to show you a video and

22  ask you if you recognize it.

23      THE COURT:  Are you going to need -- you have

24  got to put some foundation in.

1           I think you put some of it in already.

2       MR. JOHNSON:  I am assuming, Judge, he is going

3   to lay a foundation after the video is shown.

4       MR. CULLEN:  It's only about 30 seconds, I

5   think.

6                       (Whereupon, a video recording was

7                        shown open court:)

8       THE COURT:  It's shown sideways like this?

9       MR. CULLEN:  Yeah.

10      MR. GAY:  The volume is turned off, Judge.

11      MR. JOHNSON:  Your Honor, I think the State has

12  conceded that the audio is inadmissible.

13          If they are going to use audio, we would

14  object.

15      THE COURT:  Did you stop it, or is it done?

16      MR. GAY:  I stopped it, Judge, because the audio

17  was muted.

18      THE COURT:  I read through all the pleasings in

19  this, and it appeared to me from the pleadings that

20  the State was agreeing that the audio was

21  inadmissible.

22          I took that from that, that you thought the

23  audio was inadmissible.

24

1          MR. CULLEN:  Correct, Your Honor.

2              But for the purpose -- for the trial, yes.

3              For the purpose of this hearing to

4      establish that this is what she recorded, I am

5      cross-examining her to try to explain what they asked

6      her about.

7          MR. JOHNSON:  We are going to withdraw our

8      objection.

9          THE COURT:  Well, okay.

10         MR. JOHNSON:  For the purpose of this hearing.

11         THE COURT:  Let's just be clear about this.

12             I am going to be hearing the evidence which

13     is not to be used -- I guess, I could be a finder of

14     fact at this at some point in time.

15             And hearing evidence which may or may not

16     be -- well, I guess everybody is saying it is

17     inadmissible for purposes of guilt and innocence;

18     right?

19         MR. CULLEN:  Yes, that is correct.

20         THE COURT:  So for purposes of this hearing,

21     that is how we are going to use it; right?

22         MR. JOHNSON:  Yes.

23         THE COURT:  Go ahead.

24

```
 1                    (Whereupon, a video recording was

 2                    played in open court:)

 3    BY MR. CULLEN:

 4         Q    Was that the video that you recorded and

 5    the next day sent to Walter Brown?

 6         A    Yes.

 7         Q    Is that the same video that you later

 8    showed to the members of the state police when you

 9    became an informant?

10         A    Yes.

11         Q    Is that the entire video that you took on

12    the early morning hours of February 10th of 2019?

13         A    Yes.

14         Q    How is it that you actually got that to

15    Walter Brown, you know, forwarded it to him?

16              How did it get from your phone to his?

17         A    I just sent it.

18              Attach a picture to your message, and it

19    just sends.

20         Q    Like attached to a text message?

21         A    Correct.

22         Q    And that's how you sent it to him?

23         A    Uh-huh.

24         MR. CULLEN:  I don't have any further questions.
```

1       THE COURT: Redirect.

2

3              REDIRECT EXAMINATION

4  BY MR. JOHNSON:

5     Q   Did you -- you said you snorted the

6  substance each and every time Aaron did?

7       MR. CULLEN: Objection.

8          That is facts not in evidence, Judge.

9       THE COURT: Overruled.

10         He is asking if she said that.

11         Do you understand the question?

12  BY MR. JOHNSON:

13    Q   Did you state that you snorted the cocaine

14  each and every time Aaron Feiza did using the same

15  bowl?

16    A   No.

17    Q   Let me clarify this.

18         So some of the times Aaron Feiza snorted a

19  substance, that bowl went around, and you did not

20  snort it; is that Correct?

21    A   They didn't pass it to every person every

22  time.

23         If you wanted it, you just grabbed the

24  plate and got some.

1       Q       So some times you were excluded?

2       A       That is correct.

3       Q       On that video that shows Aaron snorting a

4    substance, did you snort on that -- from that plate

5    on that pass around of the plate?

6               Do you remember?

7       A       I don't remember.

8       Q       So it's possible you did, and it's possible

9    you didn't; is that right?

10      A       That's fair.

11      Q       When you texted the video or sent the video

12   to Mr. Brown, did you text it or email it?

13              Or do you remember?

14      A       It was either a text or Messenger.

15      Q       FaceBook?

16      A       FaceBook Messenger.

17              Typically he couldn't get videos on his

18   regular text messages.

19              So often it would be on his Messenger.

20              I don't recall.

21              I don't remember if it was on the text or

22   his Messenger.

23      Q       Did you send the whole video once, or did

24   it take a number of tries?

1          Do you remember?

2     A    I sent it, and it went right through.

3     Q    Do you know if it was FaceBook or text?

4     A    I don't remember.

5     MR. JOHNSON:  I have nothing further.

6     THE COURT:  Do you have questions, Mr. Cullen?

7

8                    CROSS-EXAMINATION

9     BY MR. CULLEN:

10    Q    Just to clarify, Aaron Feiza snorted

11    cocaine many times that night; is that correct?

12    A    Yes.

13    Q    And you snorted about three times that

14    night; is that correct?

15    A    Three or four, yes.

16    Q    So your testimony then was that every time

17    you snorted, Aaron Feiza was also snorting; correct?

18    A    Yes.

19    Q    But not every time he snorted were you

20    snorting cocaine; correct?

21    A    That is correct.

22         I could not give a number of how many times

23    either one of us snorted. I did, like I said, three

24    or four times.

```
 1              How many they did, I can't give you a
 2    number.
 3              But, yes, they did it more.
 4         MR. CULLEN:  Thank you.
 5              I have no further questions.
 6         THE COURT:  Anything based on that?
 7         MR. JOHNSON:  No, sir.
 8         THE COURT:  All right.
 9              You can step down.
10              Step down but don't leave.
11              Stay out in the hallway for a few minutes,
12    and we will call you right back.
13              I am looking at the afternoon of June 7th.
14              It's a Monday.
15         MR. CULLEN:  I am going to be out of town then.
16         THE COURT:  That whole week?
17         MR. CULLEN:  Yes.
18         THE COURT:  How about the next Monday, the 14th?
19              I can give you the whole afternoon.
20         MR. CULLEN:  June 14th works for me.
21         MR. CAMIC:  June 14th works for us.
22              What time?
23         THE COURT:  1:30.
24              And can you fill up the whole afternoon?
```

1        MR. CAMIC:  Seems like it.

2        THE COURT:  I am going to keep it clean.

3             You have a lot of arguments to make here.

4             The other question I have would this

5   witness be called back that afternoon?

6        MR. JOHNSON:  No.

7             We are done with her, Judge.

8        THE COURT:  State?

9        MR. CULLEN:  We don't need her either, Judge.

10        THE COURT:  I am going to have her come back and

11   tell her she is released from any subpoenas that have

12   been subpoenaed.

13             You can bring her back in, Rich.

14             Apparently you are not going to be needed

15   for the next time this case is up for these motions.

16             You are released from your subpoenas.

17             You are going to have to serve her again if

18   you need her.

19        MR. CULLEN:  That's fine with us, Judge.

20        MR. JOHNSON:  It is with us, too.

21        THE COURT:  You can leave the building, and you

22   are released from all your subpoenas.

23             We are coming back on the 14th at 1:30.

24             I would like to work our way through these

1    motions.

2              Are there other witnesses to call from your

3    end?

4              I am not going to hold you to anything.

5              I would just like to know.

6        MR. CAMIC:  I don't think so.

7              I am not one hundred percent sure, but I

8    don't think so.

9        THE COURT:  Mr. Cullen, do you think you have

10   further live witnesses?

11       MR. CULLEN:  No.

12       THE COURT:  I think we should be able to get

13   through everything then.

14             We are talking about legal arguments;

15   right?

16       MR. CAMIC:  That's right.

17       THE COURT:  Let's be prepared to go through all

18   of them.

19             If we can't -- if we don't, we don't.

20             If we can, I would like to get through all

21   of them.

22             Anything else we need to do?

23       MR. CULLEN:  Not from the State.

24       THE COURT:  Counsel?

1      MR. CAMIC:  No.

2      THE COURT:  That will end the day.

3                 (Which were all the proceedings had

4                  in said matter on said date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1   STATE OF ILLINOIS  )
                        )  SS.
 2   COUNTY OF KANE     )

 3

 4   I hereby certify that I reported in shorthand the

 5   proceedings had at the hearing in the above-entitled

 6   cause, and that the foregoing Report of Proceedings

 7   is a transcript of my shorthand notes transcribed to

 8   the best of my ability.

 9

10

11

12                      _____
                        Debbie Schweer
13                      License No. 084-002319
                        Official Court Reporter
14                      16th Judicial Circuit

15

16

17

18

19

20

21

22

23

24
```